IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-19

 No. 126A18-2

 Filed 12 March 2021

 STATE OF NORTH CAROLINA

 v.
 MARDI JEAN DITENHAFER

 Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of

 the Court of Appeals, 840 S.E.2d 850 (N.C. Ct. App. 2020), finding no error in a

 judgment entered on 1 June 2015 by Judge Paul G. Gessner in Superior Court, Wake

 County. Heard in the Supreme Court on 11 January 2021.

 Joshua H. Stein, Attorney General, by Sherri Horner Lawrence, Special Deputy
 Attorney General, for the State-appellee.

 Jarvis John Edgerton, IV, for defendant-appellant.

 ERVIN, Justice.

¶1 The issue before us in this case involves the sufficiency of the evidence to

 support defendant Mardi Jean Ditenhafer’s conviction for felonious obstruction of

 justice based upon her actions in allegedly interfering with the ability of law

 enforcement officers and social workers to have access to her daughter, who had been

 sexually abused by defendant’s husband. After careful consideration of defendant’s

 challenge to the Court of Appeals’ decision, we hold that the record contains sufficient

 evidence that defendant acted with deceit and intent to defraud to support her
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 conviction for felonious obstruction of justice and affirm the decision of the Court of

 Appeals.

 I. Factual Background

 A. Substantive Facts

¶2 Defendant is the mother of Jane and the wife of William Ditenhafer, who is

 Jane’s adopted father.1 After reaching middle school, Jane developed mental health

 and self-esteem-related problems and began to engage in self-harming-related

 activities. According to Jane, defendant would become angry about her self-harming

 activities, claiming that she was acting as she was in order to get “attention” and to

 “fit in” and that Jane needed to stop what she was doing. Jane claimed to be afraid

 of Mr. Ditenhafer because of his anger, his tendency to yell at her, and the spankings

 that he would administer for the purpose of disciplining her when she got in trouble.

 Upon discovering that Jane had sent suggestive photos of herself to a middle school

 boy, defendant and Mr. Ditenhafer became very angry with Jane and prohibited her

 from using electronic devices. Around the same time, Mr. Ditenhafer, with

 defendant’s knowledge, began giving Jane full-body massages to “help [her] self-

 esteem.”

 1 “Jane” and “John” are pseudonyms that are employed in order to protect the
 children’s identities and for ease of reading.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶3 After giving Jane a massage in 2013, Mr. Ditenhafer told Jane to come into the

 living room. Once she had complied with that instruction, Mr. Ditenhafer informed

 Jane that he had discovered that she had sent additional suggestive photographs to

 the boy who had received the earlier images. According to Jane, Mr. Ditenhafer

 claimed to have been “turned on” by these photos and told Jane that they “could either

 show [defendant] these photos” or she could “help him with his . . . boner.” At that

 point, Jane started crying because, “if [defendant] saw these [images] again, she

 would call the police and I would get in trouble and I would get sent to jail,” and did

 as Mr. Ditenhafer had instructed her to do.

¶4 Subsequently, Mr. Ditenhafer began to pressure Jane to engage in sexual acts

 with him on a regular basis. Over time, the abuse that Mr. Ditenhafer inflicted upon

 Jane became more serious, with such abusive episodes occurring “at least two times

 a week” when defendant was not in the home and progressing to the point that Mr.

 Ditenhafer had Jane engage in oral and vaginal sex acts with him. Jane claimed that

 Mr. Ditenhafer told her not to tell anyone about the abuse or he would make her

 sound like a “crazy lying teenager.” Jane refrained from telling defendant about the

 abuse that she was suffering at the hands of her adoptive father because she “didn’t

 think [defendant] would believe [her] and [defendant] would get angry at [her] for

 making up a lie.”
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶5 In the spring of 2013, when Jane was in the ninth grade, she visited an aunt,

 who was the sister of her biological father, in Arizona. During that visit, Jane

 informed her aunt that Mr. Ditenhafer had been sexually abusing her. At that point,

 Jane and her aunt called defendant for the purpose of telling defendant about the

 abuse that Jane had experienced. Defendant reacted to the information that Jane

 and her aunt had provided by becoming angry with Jane.

¶6 The aunt reported Jane’s accusations against Mr. Ditenhafer to law

 enforcement officers in Arizona. The Arizona officers, in turn, contacted Detective

 Stan Doremus of the Wake County Sheriff’s Office, who initiated an investigation into

 Jane’s allegations. Jane testified that, upon her return to North Carolina, defendant

 picked her up from the airport and told her that defendant did not believe Jane’s

 accusations; that Jane “needed to tell the truth and recant and not — and not lie

 anymore because it was going to tear apart the family and it was just going to end

 horribly”; and “that [Jane] didn’t need to do this.”

¶7 After learning of Jane’s accusations against Mr. Ditenhafer, Susan Dekarske,

 a social worker employed by the Child Protective Services Department of Wake

 County Human Services, interviewed defendant and Mr. Ditenhafer, both of whom

 denied Jane’s accusations. Even so, Mr. Ditenhafter agreed to move out of the family

 home and to refrain from communicating with Jane during the pendency of the

 investigation.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶8 On 11 April 2013 Jane and defendant met with Detective Doremus and Ms.

 Dekarske at the family home. After Ms. Dekarske asked to speak with her privately,

 Jane told Ms. Dekarske about several instances of sexual abuse that she had suffered

 at the hands of Mr. Ditenhafer, the fact that defendant urged Jane to recant her

 accusations against her adoptive father, and the fact that defendant had blamed Jane

 for destroying the family given that Mr. Ditenhafer “would get 15 years in prison,

 that [defendant] would also lose her job and that [John] would lose his dad, [and] they

 will lose the house.” On 22 May 2013, Detective Doremus and Ms. Dekarske went to

 Jane’s school for the purpose of speaking with her privately in light of their

 understanding that defendant had been pressuring Jane to deny the truthfulness of

 her claims against Mr. Ditenhafer.

¶9 On 21 June 2013, Detective Doremus and Ms. Dekarske again met with

 defendant and Jane at the family home. During the course of this meeting, defendant

 “had her hand on [Jane]’s thigh virtually the whole time” and “was answering the

 questions for [Jane].” When Detective Doremus asked defendant whether she

 thought that Jane’s accusations against Mr. Ditenhafer were true, defendant, who

 appeared to be shocked, responded by stating that “there is some truth to everything

 that [Jane] says but not all of it is true.” In addition, defendant told Ms. Dekarske

 that she and Jane had been working to improve their ability to communicate with

 each other and that, while defendant believed a portion of what Jane had been saying,
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 she “did not believe it was” Mr. Ditenhafer who had abused Jane. After Detective

 Doremus and Ms. Dekarske asked if they could speak with Jane privately, defendant

 responded that she was not comfortable with allowing Jane to be alone with Detective

 Doremus and declined to allow this request.

¶ 10 Detective Doremus and Ms. Dekarske met with Jane in private again on 11

 July 2013. Detective Doremus recalled that, as soon as she entered the meeting room,

 Jane “became upset and said that the only reason that [defendant] let her talk with

 us alone is because [Jane was] supposed to recant” and that, upon making this

 statement, Jane “started to cry, [and] said she was not going to recant to us because

 she was telling the truth.” As the meeting progressed, defendant sent text messages

 to Jane asking how the meeting was going, interrupted the meeting by entering the

 room in which the interview was taking place, and appeared angry when Detective

 Doremus informed her that Jane had not recanted her accusations against her

 adoptive father. After Detective Doremus showed defendant a stack of sexually

 explicit e-mails that Mr. Ditenhafer had sent to Jane, defendant “looked at one page

 [of the e-mails], . . . flipped over to another page, and then left” with Jane in a

 “[h]urried, angry, rushed” manner.

¶ 11 As the investigation continued, defendant remained angry with Jane and

 continued to pressure her to recant. At one point, defendant threatened to take Jane

 to a psychiatric hospital because Jane was “crazy.” When asked about the nature of
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 the comments that defendant had made to her during this period of time, Jane

 testified that

 [defendant] would tell me I was manipulative and crazy
 and how I needed to tell the truth because I was tearing
 apart her family and destroying her family and that [Mr.
 Ditenhafer] was going to go to jail because of my lies and
 [my younger brother] was going to turn into a drug addict
 and drop out of high school and that I was, like, ruining,
 like, our family. And this one time she also called me a
 manipulative bitch.

 In addition, defendant forbade Jane from visiting or talking with her Arizona

 relatives until she told them that she had falsely accused Mr. Ditenhafer of sexually

 abusing her. Defendant also informed Jane that a family trip to Disneyland was “not

 going to happen because we’re going to lose our money and we’re going to lose our

 stuff and the animals” and that, on the other hand, if Jane recanted her allegations

 against Mr. Ditenhafer, the family could still go to Disneyland. Finally, defendant

 told Jane that defendant might have breast cancer and that Jane needed to stop lying

 about the way in which her adoptive father had treated her because those lies were

 causing defendant to experience stress.

¶ 12 The conduct in which defendant engaged and Jane’s fear that she would lose

 her relationship with her younger brother finally caused Jane to recant her

 accusations against Mr. Ditenhafer in early August 2013. On 5 August 2013, as Ms.

 Dekarske was preparing to leave after meeting with Jane and defendant at the family

 home, Jane ran outside and told Ms. Dekarske that she needed to tell her something.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 Then, in a manner that Ms. Dekarske described as “robotic” and “rehearsed,” Jane

 stated, “I just want to let you know I am recanting my story and I’m making it all

 up.” As Ms. Dekarske looked back towards the house, she saw defendant watching

 from the window, so she decided to end the conversation and discuss the subject with

 Jane at a later time.

¶ 13 On 7 August 2013, Jane called Detective Doremus and told him, while

 defendant listened, that she wished to recant her accusations against Mr. Ditenhafer.

 In addition, Jane sent an e-mail to Detective Doremus for the purpose of telling him

 that she wished to recant, with defendant having “prompted [Jane] on what to write.”

¶ 14 On 29 August 2013, Detective Doremus went to Jane’s school for the purpose

 of meeting with Jane. As she entered the room in which the meeting was to take

 place, Jane appeared to be nervous and told Detective Doremus that “I’m not

 supposed to talk to you.” In response, Detective Doremus informed Jane that, while

 he believed that her allegations against her adoptive father were true, the Wake

 County Sheriff’s Office had ended its investigation and Mr. Ditenhafer would not be

 prosecuted for sexually abusing her.

¶ 15 Mr. Ditenhafer moved back into the family home around Thanksgiving and

 resumed his practice of sexually abusing Jane while defendant was absent from the

 house. On 5 February 2014, defendant entered the bedroom that she shared with Mr.

 Ditenhafter and observed Mr. Ditenhafer engaging in vaginal intercourse with Jane.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 As Jane retreated into the adjacent bathroom, defendant angrily yelled “What’s going

 on? What is this?” While Jane stood crying in the bathroom, defendant asked Jane

 whether this was her “first time.” Although Jane contemplated telling defendant that

 Mr. Ditenhafer had habitually abused her for the past several years, she told

 defendant instead that “my boyfriend and I have done it before.”

¶ 16 Later that day, defendant drove Jane to a McDonald’s at which defendant

 planned to retrieve a cell phone that Detective Doremus had examined during the

 investigation of Jane’s earlier accusations against Mr. Ditenhafer. At that time, Jane

 told defendant that she had been telling the truth about Mr. Ditenhafer’s conduct and

 that he had continued to sexually abuse her. In response, defendant stated that “I’m

 not sure if I believe you or not, but I just—I need to handle this first” before exiting

 the vehicle to obtain the cell phone from Detective Doremus. Defendant did not report

 what she had witnessed to Detective Doremus and refused to allow Jane to speak

 with him. In addition, defendant directed Jane to refrain from telling anyone else

 about what Mr. Ditenhafer had been doing to her “[b]ecause it was family business”

 and instructed Jane to help her discard the sheets and bedding upon which the abuse

 had occurred.

¶ 17 On 16 March 2014, defendant called Mr. Ditenhafer’s brother and told him that

 she had walked in upon an act of sexual abuse involving Mr. Ditenhafer and Jane.

 After receiving this information, which he found to be shocking, the brother-in-law
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 continued to communicate with defendant over the course of the next several weeks

 for the purpose of helping defendant determine how she should protect herself and

 the children. Although the brother-in-law initially thought that defendant would act

 in the children’s best interest, she informed him a few weeks after their initial

 conversation that she intended to refrain from “involv[ing] anyone else or the

 authorities because that would cost them more money and time” and because “[w]e

 don’t need anymore [sic] drama.” At this point, the brother-in-law notified Child

 Protective Services about the sexual abuse that Mr. Ditenhafer had perpetrated upon

 Jane, resulting in the initiation of a new investigation by that agency.

¶ 18 On 29 April 2014, Robin Seymore, a Wake County Human Services employee,

 went to Jane’s school for the purpose of interviewing Jane. Jane appeared anxious

 during her conversation with Ms. Seymore, denied that Mr. Ditenhafer had ever

 abused her, and called defendant to let her know that Ms. Seymore was there asking

 questions. After the end of her conversation with Jane, Ms. Seymore went to John’s

 school in order to interview him. Within five minutes after Ms. Seymore’s discussion

 with John had begun, defendant burst into the room in which the interview was being

 conducted, grabbed John, and told Ms. Seymore, “[a]bsolutely not. You’re not going

 to talk to him. You are not going to talk to him. This is not happening.” After making

 this series of statements, defendant told Ms. Seymore that “I have nothing to say to

 you” before leaving the interview room with John.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶ 19 On 30 April 2014, Ms. Seymore went to the family home for the purpose of

 interviewing defendant. In spite of the fact that rain was pouring down and thunder

 could be heard, defendant told Ms. Seymore, “[y]ou’re not coming into the house” and

 insisted that they talk outside. In the course of the ensuing conversation, defendant

 stated that Mr. Ditenhafer had stopped living in the family home during the

 preceding February while insisting that his departure “had nothing to do with the

 children or [Jane]” and suggested that his absence stemmed from the fact that “they

 had marital problems.” In addition, defendant stated that her husband had decided

 to refrain from entering the house anymore in order to “avoid any more lies from

 [Jane].” After Ms. Seymore left the family home following her conversation with

 defendant, she and her supervisor decided to seek the entry of an order taking Jane

 into the nonsecure custody of Wake County Human Services.

¶ 20 On 1 May 2014, Detective Doremus and other law enforcement officers came

 to the family home for the purpose of placing defendant under arrest and taking Jane

 into the custody of the Wake County Department of Human Services. After their

 arrival, the officers observed defendant driving towards the residence. Upon

 discovering that Detective Doremus and the other officers were present, defendant

 backed up, turned around, and began to drive away. After the officers followed

 defendant and activated their emergency lights, defendant, who had Jane and John

 in the vehicle with her, pulled over on the side of the road, rolled up the windows,
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 locked the doors, and phoned her attorney while ignoring the officers’ requests that

 she exit from her vehicle. As she sat in the car with the children, defendant told Jane,

 “[d]on’t say anything. Don’t get out of the car . . . If they try and take you away,

 [Jane], don’t go. Refuse to go. . . . Run down the street. Just don’t go.” Eventually,

 defendant complied with the officers’ requests and was placed under arrest.

 B. Procedural History

¶ 21 On 20 May 2014, the Wake County grand jury returned a bill of indictment

 charging defendant with one count of felonious obstruction of justice and one count of

 accessory after the fact to sexual activity by a substitute parent. On 9 September

 2014, the Wake County grand jury returned a superseding indictment charging

 defendant with being an accessory after the fact to sexual activity by a substitute

 parent based upon an event that allegedly occurred on or about 5 February 2014. On

 10 March 2015, the Wake County grand jury returned another superseding

 indictment charging defendant with two counts of felonious obstruction of justice,

 with one count alleging that defendant had obstructed justice by encouraging Jane to

 recant her allegations of sexual abuse against Mr. Ditenhafer on or about the period

 from 11 July 2013 to 1 September 2013 and with the second count alleging that

 defendant had obstructed justice by denying employees of the Wake County Sheriff’s

 Office and the Wake County Department of Human Services access to Jane on or

 about the period from 11 July 2013 to 1 September 2013.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶ 22 The charges against defendant came on for trial before the trial court and a

 jury at the 25 May 2015 criminal session of the Superior Court, Wake County. At the

 close of the State’s evidence, defendant, who did not offer evidence on her own behalf,

 unsuccessfully moved to dismiss all three of the charges that had been lodged against

 her for insufficiency of the evidence and on the basis of “a variance between the crime

 alleged in the indictment and any crime for which the State’s evidence may have been

 sufficient to warrant submission to the jury[.]” On 1 June 2015, the jury returned

 verdicts convicting defendant of felonious obstruction of justice by encouraging Jane

 to recant the allegations of sexual abuse that she had made against Mr. Ditenhafer,

 felonious obstruction of justice based upon her actions in denying employees of the

 Wake County Sheriff’s Office and the Wake County Department of Human Services

 access to Jane, and accessory after the fact to sexual activity by a substitute parent.

 Based upon the jury’s verdicts, the trial court entered a judgment sentencing

 defendant to a term of six to seventeen months imprisonment based upon the first of

 her two convictions for felonious obstruction of justice, a judgment sentencing

 defendant to a consecutive term of six to seventeen months imprisonment based upon

 her second conviction for felonious obstruction of justice, and a judgment sentencing

 defendant to a consecutive term of thirteen to twenty-five months imprisonment

 based upon her conviction for accessory after the fact to sexual activity by a substitute
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 parent. Defendant noted an appeal to the Court of Appeals from the trial court’s

 judgments.

¶ 23 In seeking relief from the trial court’s judgments before the Court of Appeals,

 defendant argued that the trial court had erred by denying her motions to dismiss all

 three of the charges that had been lodged against her for insufficiency of the evidence

 and by “failing to limit Defendant’s culpable conduct in its jury instruction for

 accessory after the fact to her failure to report abuse.” State v. Ditenhafer, 258 N.C.

 App. 537, 547 (2018), aff’d in part and rev’d in part, 373 N.C. 116 (2019). In a divided

 decision, the Court of Appeals found no error in the trial court’s judgment relating to

 the first of defendant’s obstruction of justice convictions, which rested upon

 defendant’s conduct in encouraging Jane to recant her accusations against Mr.

 Ditenhafer, on the grounds that the record contained sufficient evidence to support

 defendant’s conviction. Id. at 547–49. On the other hand, the Court of Appeals

 overturned the trial court’s judgment relating to the second of defendant’s obstruction

 of justice convictions, which rested upon defendant’s conduct in precluding

 investigating officials from having access to Jane, on the grounds that the record did

 not contain sufficient evidence to support that conviction. Id. at 550–51. Finally, the

 Court of Appeals reversed the judgment that the trial court had entered based upon

 defendant’s conviction for accessory after the fact to sexual activity by a substitute

 parent on the grounds the indictment that had been returned against defendant
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 “fail[e]d to allege any criminal conduct” and, instead, sought to hold defendant liable

 for an omission unrelated to the performance of any criminal act. Id. at 551–53. The

 State noted an appeal to this Court from the Court of Appeals’ decision relating to

 defendant’s conviction for accessory after the fact to sexual activity by a substitute

 parent based upon a dissenting opinion by Judge Inman and this Court granted the

 State’s request for discretionary review with respect to the issue of whether the record

 contained sufficient evidence to support defendant’s conviction for the felonious

 obstruction of justice charge relating to defendant’s actions in precluding

 investigating officials from having access to Jane.

¶ 24 On 1 November 2019, this Court filed an opinion in which it affirmed the Court

 of Appeals’ decision to reverse defendant’s conviction for accessory after the fact to

 sexual activity by a substitute parent. State v. Ditenhafer, 373 N.C. 116, 129 (2019).

 In addition, we overturned the Court of Appeals determination that the trial court

 had erred by denying defendant’s motion to dismiss the charge that defendant had

 feloniously obstructed justice by denying investigating officials access to Jane for

 insufficiency of the evidence on the grounds that the record contained sufficient

 evidence “to persuade a rational juror that defendant denied officers and social

 workers access to Jane.” Id. at 129 (cleaned up). In support of this conclusion, we

 pointed to the presence of evidence tending to show that defendant had “talked over

 Jane during several interviews . . . in such a manner that Jane was precluded from
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 answering the questions,” that defendant had “interrupted an interview . . . by

 constantly sending Jane text messages and by abruptly removing Jane from the

 interview,” and that defendant “successfully induced Jane to refuse to speak with

 investigating officers and social workers” on multiple occasions. Id. at 128. As a

 result, we remanded this case to the Court of Appeals for the limited purpose of

 determining “whether there [was] sufficient evidence to enhance the charge of

 obstruction of justice for denying access to Jane from a misdemeanor to a felony under

 N.C.G.S. § 14-3(b).” Id. at 129.

¶ 25 On remand from this Court, the Court of Appeals held that there was sufficient

 record evidence to support defendant’s conviction for felonious, as compared to

 misdemeanor, obstruction of justice on the grounds that defendant had precluded

 investigating officials from having access to Jane. State v. Ditenhafer, 840 S.E.2d

 850, 855 (N.C. Ct. App. 2020) (holding that “the State [had] introduced evidence,

 taken in the light most favorable to it, that [d]efendant acted with deceit and the

 intent to defraud”). In support of its determination that defendant’s actions had

 involved deceit and the existence of an intent to defraud, the Court of Appeals pointed

 to the fact that defendant “did not permit [Jane] to answer questions and answered

 for her in one interview, sent text messages and physically interrupted another

 interview, and sought to constantly influence [Jane]’s statements in those interviews

 by verbally abusing and punishing [Jane] for the statements she was making.” Id. at
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 856. In addition, the Court of Appeals noted the presence of evidence tending to show

 that defendant had “instructed [Jane] not to speak with investigators and directed

 investigators not to speak with [Jane] in private, ensuring that the daughter did not

 have the opportunity to give investigators truthful statements regarding the abuse”

 and that “[d]efendant [had] controlled the narrative by coaching [Jane] on what to

 say, listening on the line when [Jane] recanted her story to Detective Doremus, and

 prompting [Jane] on what to write in the [e-mail] in which [Jane] recanted her story.”

 Id. (cleaned up). In dissenting from the majority’s decision, Judge Tyson stated that

 the presence of deceit and an intent to defraud “is not what the indictment alleges

 nor what the State’s evidence shows” and asserted that, on the contrary, the record

 evidence demonstrated that “[d]efendant presented her daughter and allowed access

 every time upon request,” with this fact tending to negate any contention that

 defendant acted with deceit and intent to defraud. Id. at 858 (Tyson, J., dissenting).

 Defendant noted an appeal to this Court from the Court of Appeals’ decision based

 upon Judge Tyson’s dissent.

 II. Substantive Legal Analysis

¶ 26 In seeking to persuade us to overturn the Court of Appeals’ decision, defendant

 argues that the record is devoid of substantial evidence tending to show that she acted

 with either deceit or the intent to defraud in the course of denying investigating

 officials access to Jane. According to defendant, the record evidence uniformly
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 demonstrates that, during the time period set out in the relevant count of the

 indictment, she did not believe Jane’s accusations against Mr. Ditenhafer. In

 addition, defendant contends that, in light of the fact that she did not believe Jane’s

 accusations against her husband, her attempt to induce Jane to recant her

 accusations against Mr. Ditenhafter amounted to an effort to persuade Jane to tell

 the truth “even if [she was] ultimately wrong about what the truth was.” In support

 of this argument, defendant directs our attention to what she describes as the

 expressions of shock that defendant made when she interrupted Mr. Ditenhafer’s

 abuse of Jane in February 2014. As a result, defendant maintains that her “actions

 during the relevant period were not intended to deceive; but, instead, were intended

 to protect [Mr. Ditenhafer] from what [defendant] incorrectly believed was a false

 accusation.”

¶ 27 In seeking to persuade us to refrain from disturbing the Court of Appeals’

 decision, the State argues that “the Court of Appeals majority properly followed this

 Court’s directive and determined that the State presented sufficient evidence to

 support defendant’s felony obstruction of justice charge for denying access to the

 minor sexual abuse victim, Jane.” After acknowledging defendant’s claim that “she

 believed Jane was abused by someone other than [Mr. Ditenhafer],” the State points

 out that defendant “inconsistently took many steps to intervene in and frustrate law

 enforcement and [social services]’ investigations into the sexual abuse.” In essence,
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 the State argues that, “[h]ad defendant indeed committed her acts during the

 investigation as Jane’s concerned biological mother free of any intent to deceive or

 defraud, defendant would have cooperated with any investigation of Jane’s reported

 sexual abuse” while, instead, defendant “did everything other than cooperate with

 the investigation” in order “to maintain her belief of a happy life with [Mr.

 Ditenhafer].” The State further argues that “[d]efendant’s intent to deceive and

 defraud is further revealed by her failure to report or even acknowledge the sexual

 abuse after directly witnessing it firsthand.” As a result, the State argues that

 “[d]efendant’s many actions of pressuring Jane to recant during the indictment period

 and witnessing the sexual abuse firsthand after the indictment period both show

 defendant’s overall mental attitude towards Jane’s sexual abuse allegations and

 defendant’s selfish persistent desire to protect [her husband] and what she believed

 to be her good life” and permitted the jury to infer “her intent . . . from the

 circumstances and her actions throughout the investigation.”

¶ 28 In deciding whether to grant or deny a motion to dismiss for insufficiency of

 the evidence, “the trial court need determine only whether there is substantial

 evidence of each essential element of the crime and that the defendant is the

 perpetrator.” State v. Crockett, 368 N.C. 717, 720 (2016) (quoting State v. Hill, 365

 N.C. 273, 275 (2011)). Substantial evidence is “such relevant evidence as a reasonable

 mind might accept as adequate to support a conclusion.” State v. Stone, 323 N.C. 447,
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

451 (1988) (quoting State v. Smith, 300 N.C. 71, 78–79 (1980)). Put another way,

substantial evidence is that which is “necessary to persuade a rational juror to accept

a conclusion.” Crockett, 368 N.C. at 720 (quoting Hill, 365 N.C. at 275). In

determining whether the record contains sufficient evidence to support the

submission of the issue of defendant’s guilt of a criminal offense to the jury, the trial

court must consider the evidence “in the light most favorable to the State,” with the

State being “entitled to every reasonable intendment and every reasonable inference

to be drawn therefrom,” State v. Powell, 299 N.C. 95, 99 (1980), and with

“contradictions and discrepancies [being] for the jury to resolve” instead of

“warrant[ing] dismissal,” State v. Winkler, 368 N.C. 572, 574 (2015) (quoting Powell,

299 N.C. at 99). For that reason, “[t]he evidence need only give rise to a reasonable

inference of guilt in order for it to be properly submitted to the jury.” Stone, 323 N.C.

at 452 (citing State v. Jones, 303 N.C. 500, 504 (1981)). In view of the fact that

determining whether the record contains sufficient evidence to support the

defendant’s guilt of a criminal offense requires resolution of “a question of law,”

Crockett, 368 N.C. at 720, this Court reviews challenges to the sufficiency of the

evidence to support the jury’s decision to convict the defendant of committing a crime

using a de novo standard of review, State v. Melton, 371 N.C. 750, 756 (2018) (citing

State v. Chekanow, 370 N.C. 488, 492 (2018)).
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶ 29 At the time that this case was initially before the Court, we held, among other

 things, that the record contained sufficient evidence to support the submission of the

 issue of defendant’s guilt of obstruction of justice based upon an allegation that

 defendant had denied investigating officials access to Jane to the jury. Ditenhafer,

 373 N.C. at 128–29. As a result, the sole issue before the Court of Appeals on remand

 was whether the record contained sufficient evidence to support defendant’s guilt of

 felonious, rather than misdemeanor, obstruction of justice on the basis of N.C.G.S. §

 14-3(b), id. at 129, which provides that, “[i]f a misdemeanor as to which no specific

 punishment is prescribed be infamous, done in secrecy and malice, or with deceit and

 intent to defraud, the offender shall, except where the offense is a conspiracy to

 commit a misdemeanor, be guilty of a Class H felony,” N.C.G.S. § 14-3(b) (2019). As

 the Court of Appeals has correctly held, a defendant commits felonious, as compared

 to misdemeanor, obstruction of justice in the event that he or she “(1) unlawfully and

 willfully (2) obstruct[s] justice by providing false statements to law enforcement

 officers investigating [a crime] (3) with deceit and intent to defraud.” State v. Cousin,

 233 N.C. App. 523, 531 (2014). After considering the evidence in the light most

 favorable to the State, as we are required to do in accordance with the applicable

 standard of review, we hold that the record contains sufficient evidence to support a

 jury determination that defendant acted with deceit and an intent to defraud when

 she denied investigating officials access to Jane.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶ 30 At trial, the State asserted that defendant sought to deprive investigating

 officials of meaningful access to Jane in order to preclude her from accusing Mr.

 Ditenhafer of sexually abusing her. In support of this assertion, the State elicited

 evidence concerning numerous incidents that occurred during the time period

 specified in the relevant indictment count. For example, the State presented evidence

 that defendant answered questions for Jane during meetings with investigators in

 order to preclude Jane from answering the questions that were posed to her in a

 truthful manner. In addition, defendant told investigating officials that they were

 not allowed to speak with Jane privately and instructed Jane to recant the truthful

 accusations that she had made against Mr. Ditenhafer. On one occasion, defendant

 interrupted a private meeting between Jane and the investigating officials and

 removed Jane from the meeting. In the same vein, the record contains evidence

 tending to show that defendant drafted an e-mail which appeared to state that Jane’s

 accusations against defendant were false and required Jane to send that e-mail to

 investigating officials. As a result, the record contains evidence tending to show that,

 in addition to simply precluding investigating officials from having access to Jane,

 defendant actively encouraged Jane to make what everyone now acknowledges to

 have been false statements exonerating Mr. Ditenhafer from criminal liability for his

 sexual abuse of Jane.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

¶ 31 Admittedly, the mere existence of evidence tending to show the nature of

 defendant’s obstructive activities does not suffice to show that she acted with the

 deceit and intent to defraud necessary to support her conviction for felonious, as

 compared to misdemeanor, obstruction of justice. In addition to containing evidence

 recounting defendant’s obstructive activities, the record is also replete with evidence

 tending to suggest that, instead of being engaged in a disinterested search for the

 truth, defendant knew that Jane’s accusations against her husband were likely to be

 true and had motives other than a desire for truthfulness in seeking to interfere with

 the investigation into the validity of Jane’s accusations against Mr. Ditenhafer. For

 example, during an early stage in the investigation, defendant acknowledged to

 investigating officials that Jane had probably been abused and that some, but not all,

 of Jane’s accusations were truthful. In light of this admission, the jury could

 reasonably have concluded that defendant did, in fact, know that something had

 happened to Jane and that her accusations rested upon something more than a mere

 fabrication. Similarly, defendant’s knowledge that Mr. Ditenhafer had begun giving

 full-body massages to Jane sufficed to put defendant on notice that the nature of the

 interactions between Jane and her adoptive father, at an absolute minimum, posed a

 risk of harm to Jane. In addition, defendant continued her obstructive conduct after

 being shown inappropriate e-mails that Mr. Ditenhafer had sent to Jane. Finally,

 defendant’s repeated statements that Jane’s accusations risked the destruction of the
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 existing family structure and harm to other members of the family provided ample

 support for a jury finding that defendant’s conduct was motivated by a desire to

 preserve the existing family structure, from which she clearly believed that she

 derived benefits, rather than an attempt to dissuade Jane from making false

 accusations against Mr. Ditenhafer.

¶ 32 The inference that defendant was acting with deceit and an intent to defraud

 that the jury was entitled to draw based upon the evidence of defendant’s conduct

 during the period of time specified in the relevant count of the indictment is

 substantially bolstered by the evidence concerning defendant’s conduct in the

 aftermath of her discovery in September 2014 that Mr. Ditenhafer was, in fact,

 sexually abusing Jane.2 In spite of the fact that she now had conclusive proof that

 Jane’s accusations against Mr. Ditenhafer were true, defendant continued to attempt

 to protect her husband from the consequences of his actions. For example, the record

 reflects that defendant appeared to be more concerned about issues relating to Jane’s

 chastity than about the impact of Mr. Ditenhafer’s abusive conduct upon her

 daughter. In addition, defendant destroyed the bedding upon which the sexual abuse

 had occurred. On the same day upon which defendant obtained confirmation that

 2 Assuming, without deciding, that evidence concerning defendant’s conduct outside

 the time period specified in the relevant count of the indictment is not admissible as
 substantive evidence of defendant’s guilt of obstruction of justice, we see no reason why that
 conduct is not relevant to the issue of the intent with which defendant acted when she
 obstructed investigating officials’ access to Jane during the relevant time period.
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 Jane’s accusations against Mr. Ditenhafer were true, defendant failed to report the

 adoptive father’s conduct to Detective Doremus during a meeting held for the purpose

 of retrieving Jane’s cell phone and refused to allow Jane to speak with Detective

 Doremus. After acknowledging the abuse that Mr. Ditenhafer had inflicted upon

 Jane, defendant told her brother-in-law that she had talked to a lawyer and a

 therapist and that both of them had advised her to refrain from involving anyone else

 because “[w]e don’t need anymore [sic] drama” and because the making of such a

 report would “cost them more money and time.” Finally, when law enforcement

 officers came to the family home for the purpose of arresting defendant and taking

 Jane into nonsecure custody, defendant attempted to escape while instructing Jane

 to “[r]efuse to go” with the officers and to “[r]un down the street” instead. As a result,

 the extensive evidence of defendant’s efforts to protect Mr. Ditenhafer from the

 consequences of his actions after her discovery that Jane’s accusations of sexual abuse

 were true coupled with the statements that defendant made to the brother-in-law

 provides substantial additional support for the State’s contention that, rather than

 simply trying to ensure that investigating officials were not misled by Jane’s false

 accusations against Mr. Ditenhafer, defendant acted with deceit and an intent to

 defraud.

¶ 33 As a result, for all of these reasons, we hold that the record evidence, when

 taken in the light most favorable to the State, provides more than sufficient support
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

for a jury finding that defendant precluded investigating officials from having access

to Jane with deceit and the intent to defraud. Although defendant does, of course,

take a contrary position and although the record does not contain any evidence

tending to show that defendant actually admitted that she had obstructed the State’s

attempts to investigate Jane’s accusations against Mr. Ditenhafer for nefarious

reasons, the absence of such direct evidence concerning defendant’s mental state does

not, of course, preclude the State from attempting to establish defendant’s guilt

through the use of inferences derived from circumstantial evidence. On the contrary,

the presence of evidence tending to show defendant’s persistent refusal to

acknowledge the truthfulness of Jane’s accusations against Mr. Ditenhafer in the face

of Jane’s assertions that she was telling the truth, defendant’s knowledge of what

appear to have been inappropriate interactions between Mr. Ditenhafer and Jane,

defendant’s refusal to credit or even review evidence tending to bolster the credibility

of Jane’s accusations against Mr. Ditenhafer, and the fact that defendant appears to

have been acting on the basis of motives other than a disinterested search for truth

during the offense date range specified in the relevant count of the indictment

suffices, standing alone, to support a reasonable inference that defendant acted with

deceit and an intent to defraud rather than in the course of a permissible attempt to

exercise her constitutional rights as Jane’s parent. And, when one considers the

record evidence concerning defendant’s conduct after discovering Mr. Ditenhafer in
 STATE V. DITENHAFER

 2021-NCSC-19

 Opinion of the Court

 the very act of abusing Jane, the evidence that defendant precluded investigating

 officials from having access to Jane deceitfully and with an intent to defraud seems

 even more compelling. Thus, for all of these reasons, we have no hesitation in

 concluding that the Court of Appeals did not err by upholding defendant’s conviction

 for felonious obstruction of justice based upon defendant’s interference with

 investigating officials’ access to Jane.

 III. Conclusion

¶ 34 A careful review of the evidence presented for the jury’s consideration

 persuades us that the record, when viewed in the light most favorable to the State,

 contains substantial evidence tending to show that defendant had acted with deceit

 and an intent to defraud at the time that she obstructed justice by denying officers of

 the Wake County Sheriff’s Office and Wake County Department of Human Services

 employees access to Jane during their investigation of Jane’s allegations against Mr.

 Ditenhafer. As a result, the Court of Appeals’ decision to find no error in the trial

 court’s judgment based upon defendant’s conviction for felonious obstruction of justice

 arising from the denial of access to Jane is affirmed.

 AFFIRMED.